THE AMERICAN EXCHANGE NATIONAL BANK OF CHICAGO

*v.*

JAMES H. WALKER.

*Filed at Ottawa November 9, 1896.*

1. VOLUNTARY ASSIGNMENTS—*rights of creditors upon fraudulent discontinuance.* Where, by fraudulent discontinuance of assignment proceedings, the trust funds are withdrawn from the control of the court within the time allowed by law for creditors to file claims, the fact that a creditor not assenting to such discontinuance failed to file his claim before the court lost jurisdiction does not prevent him from pursuing the trust funds.

2. SAME—*assets cannot be used to procure assent of creditors to discontinuance.* The assent of creditors to a discontinuance of assignment proceedings, provided for by statute, (Laws of 1879, p. 57,) must be voluntary, and the estate cannot be used in buying up claims to procure such assent. (*Howe* v. *Warren,* 154 Ill. 227, and *Terhune* v. *Kean,* 155 id. 506, followed.)

3. SAME—*upon discontinuance the unadministered estate is subject to creditors' claims.* Upon discontinuance of assignment proceedings by consent of creditors, the estate cannot, as against creditors, be turned over to a trustee to hold as security for money advanced to buy up the assenting creditors' claims, as such a transaction is void; nor will it be validated by the fact that the one who made such advances was himself a creditor of the estate, attempting in such manner merely to secure priority.

4. SAME—*claims bought at discount cannot be set up at face value.* A creditor of an assigned estate who buys at a large discount a majority of the claims, thereby procuring a discontinuance of the proceedings by consent, cannot, upon bill filed by a non-assenting creditor to reach the unadministered assets, set up against such fund the face value of the purchased claims, as he is entitled only to the amount expended.

5. CREDITOR'S BILL—*when it lies to reach assets of insolvent—decree not excessive.* After a fraudulent discontinuance of assignment proceedings a non-assenting creditor may assert, in equity, his right to assets fraudulently transferred, and may be decreed his claim in full, where all other claims are satisfied and enough funds have been fraudulently disposed of to have paid his claim.

*American Exchange Nat. Bank* v. *Walker,* 60 Ill. App. 510, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

SWIFT, CAMPBELL, JONES & MARTIN, for appellant.

WILLITS, CASE & ODELL, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Appellee filed his creditor's bill, based on a judgment recovered by him June 4, 1890, against the Q. W. Loverin Company, for $1874.82 and costs, and in said bill alleged that appellant entered into a fraudulent scheme with the said company and other defendants therein named, by which the proceedings in a voluntary assignment of said company in the county court of Cook county were discontinued and the assets of the insolvent were turned over to appellant, and by it converted in part to its own

use and given away in part without consideration. It was charged that the assets so turned over were received by appellant in trust for appellee, as a creditor of the insolvent, and the bill prayed for a decree against appellant for the amount of said judgment. The circuit court granted the relief prayed for and the Appellate Court affirmed the decree.

The facts proved were substantially as follows: On July 25, 1889, the Q. W. Loverin Company, a corporation engaged in general mercantile business in Chicago, executed a voluntary assignment to John Roper for the benefit of its creditors. The assignee qualified, took possession and continued the business. As soon as the officers of the insolvent corporation decided what they could do in the way of offers of compromise and settlement with the creditors, a plan was formulated and an arrangement made to that end. Edgar B. Tolman, acting as attorney for the insolvent, negotiated with David B. Dewey, the president of appellant, for the requisite funds to carry the proposed arrangement through if accepted by a sufficient number of creditors. Appellant was the largest single creditor, the original amount of its claim being $10,500. The proposition was to offer the other creditors forty cents on the dollar cash, or twenty cents in cash and forty cents in time paper running nine and eighteen months. Dewey satisfied himself, by investigation, that the assets in the hands of the assignee would be sufficient to pay appellant's claim in full and its advances to settle with the other creditors, if the assets were applied to that purpose. It was then agreed between him and Tolman, as attorney for the insolvent, that Tolman should make the proposition and get assignments from all the creditors who would accept, and hold them for the bank; that when sufficient creditors had accepted an application should be made to the county court for a discontinuance of the assignment proceedings, and that upon such discontinuance the assets in the hands of

the assignee should be conveyed absolutely to such party as appellant should designate. The president of the Q. W. Loverin Company saw quite a large number of the creditors with regard to the proposition, and by his efforts, and those of Tolman, as attorney, the proposition was accepted by nearly all the creditors and they assigned their claims to Tolman. On October 10, 1889, a petition was filed in the county court for a discontinuance of the assignment proceedings, together with the written consent of one hundred and sixty of the creditors, amounting to ninety-four per cent in number and ninety-two per cent in amount of the creditors and claims, mostly signed by Tolman, as assignee. The county court thereupon entered an order discontinuing the proceedings, and directing the assignee to turn over the assets to such person or persons as the said Q. W. Loverin Company might direct. The assignee turned over the assets to the Q. W. Loverin Company, and that company at the same time conveyed them, by direction of appellant, by bill of sale, to William T. VanArsdale, who executed a declaration of trust that he held them for the benefit of appellant and subject to its direction. VanArsdale carried on the business, as trustee for appellant, until February 25, 1890, when appellant had realized enough to pay its original claim in full, with interest, and to reimburse itself for its advances, with interest, and its expenses. The advances were about $17,139.20 and its claim about $12,000. Being fully satisfied for all it claimed, appellant's president, Dewey, sent for Tolman, and told him that it was ready to convey the remaining assets on VanArsdale being properly protected against outstanding indebtedness. Thereupon, on said date, VanArsdale, by the order of appellant, conveyed the assets, except book accounts, to E. H. Janes and the book acccounts to John Brown. These transfers were made by the direction of Tolman or some officer of the Q. W. Loverin Company. There was no consideration for the assignment of the

book accounts to Brown.   The conveyance to Janes was in consideration of the assumption by him of outstanding indebtedness of VanArsdale in the business, and the payment of from $200 to $300 on orders of VanArsdale to different persons for merchandise.

Appellee was a creditor who did not assign his claim to Tolman or consent to the discontinuance.   He had been notified by the assignee, as creditor, to present his claim against the insolvent, and appellant was fully informed of his claim and rights at the time of the transaction.   It does not appear whether appellee ever filed his claim with the assignee in pursuance of the notice given him, and appellant insists that his failure to aver and prove such fact is fatal to the maintenance of his bill.   The statute gave him three months in which to file his claim. The estate of the insolvent had been taken into the custody of the law for the benefit of all creditors who should file their claims within that time, and there was no priority or advantage to be gained by the first in point of time.   The order of discontinuance was entered before the expiration of the time for filing claims.   While appellee still had a right to file his claim and participate in the assets so held in trust for all such creditors the transaction had been completed, the trust fund had been removed from the custody of the court and the assignee discharged.   It would have been but an idle and useless form to attempt the filing of his claim with an assignee discharged and against an estate removed from the control of the court.   He is not now seeking to restore the jurisdiction of the county court or to enforce the assignment in that court, but to obtain redress against parties charged with defrauding him of his rights.   Whether or not an order of discontinuance could be lawfully entered within the three months need not be considered.   If it could, appellee, as a creditor with the right to file his claim, must be counted in calculating the number and amount of creditors assenting.   As he must be counted in

a discontinuance, he had an interest in it and a right of objection to it, which he may protect against a fraudulent or unauthorized discontinuance. He must be regarded the same as creditors who had already exercised their right, and if a fraudulent discontinuance deprived him of a right of participation in the fund withdrawn from the court, he would be entitled to relief against the injury done him equally as though the claim had been already filed. He had a right to pursue the trust fund or the wrongdoers.

The principal question is whether, in case of a voluntary assignment, the assigned estate can be used to procure the assent of a majority of the creditors by buying up their claims, and be subsequently applied to payment for such assent, and by this means a discontinuance be procured where there is no restoration of the estate to the debtor except in form, but it is put beyond the reach of creditors not assenting. This question has been fully answered in *Howe* v. *Warren,* 154 Ill. 227, and *Terhune* v. *Kean,* 155 id. 506. The reasoning upon which the conclusion rested need not be repeated. Such a transaction is fraudulent and void.

Counsel for appellant, while conceding that the power to obtain a discontinuance is capable of very great abuse, claim that this transaction was unobjectionable and that it is distinguishable from the above mentioned cases. Several supposed grounds of difference are pointed out, but in none of them can we see any substantial ground for a distinction between the peculiar acts of fraud in the different cases. The form adopted was somewhat different, but the substance was the same. The property was put under the protection of the county court and out of reach of appellee and the other creditors. Then, as soon as the officers determined what they could offer as a settlement, the proposition was made. Most of the creditors accepted, and nominal sales and assignments of the claims were made to the attorney of the debtor,

who was enabled to pay by the debtor, through him, pledging the assigned estate in the custody of the law to the bank for the money. The estate was used up in the arrangement, and the bargaining was done while the law shielded the property from its ordinary process. The obvious nature and effect of this transaction were the same as in the other cases.

One alleged ground of distinction specially insisted upon is, that the estate reverted to the Q. W. Loverin Company on the discontinuance and was conveyed by it to the bank,—that is to say, that while it is fraudulent to use the estate directly, it is not fraudulent to do so indirectly by carrying out a preconcerted plan to devote it to the use. It was agreed between Tolman and Dewey that upon the discontinuance the assets in the hands of the assignee should be conveyed to such party as the bank should direct. The petition for discontinuance prayed for such an order, and the order of discontinuance directed the assignee to turn over the assets to such person or persons as the company might direct. The discontinuance was not for the purpose of re-investing the title in the debtor, and it was not intended that it should have control of the estate or any power of disposition except to convey or order a conveyance to appellant. The fact that the transfer of the estate was made from the assignee, through the debtor, to the bank, and that the arrangement was carried through by that process rather than by the assignee conveying directly to the bank, can make no difference. Nor does the fact that the bank advanced the money before it got possession of the assets affect the question. They were pledged to it before it made any advances, and it is immaterial when or how the agreement for the conveyance was completed.

The claim that this case should be distinguished from the others is also placed on the ground that appellant was a creditor, and therefore entitled to engage in the scheme for the purpose of obtaining payment, although

a person without such a motive would not be so entitled. It was the privilege of appellant, as a creditor, to enter into any fair competition with other creditors to secure its claim. But this transaction was not of that character. Appellant became an active participant in a scheme to defraud non-consenting creditors of their rights in the trust estate. This was not one of its privileges as a creditor. The transaction was fraudulent, and did not extinguish the trust created by the assignment nor cut off the right of appellee to look to the property in appellant's possession for satisfaction of his debt.

It is claimed, however, that, assuming a liability to exist, the decree is excessive in amount; that the bank occupies only the position of a too diligent creditor, and that the equities of the parties in the fund are equal. It is argued that appellant is only accountable to appellee for the *pro rata* share that he would have realized if the assignment had been carried out in the county court, and that the decree should have ordered an accounting of the assets and total amount of claims, and awarded to appellee only his percentage. The argument is, in substance, that appellant merely attempted to secure priority, and the priority being set aside the equities are equal. Whether that is so or not is of no consequence, because, so far as appears, all claims against the fund had been fully satisfied, and appellant gave away sufficient remaining assets belonging to the fund to pay appellee's claim. Appellant had been reimbursed for its advances and also paid its own claim in full. It was not shown that there was any other claim unpaid, and no reason appears why whatever was left should not be applied to the payment of appellee's debt.

It is insisted that appellant could set up against the fund the claims assigned to Tolman, and by him to appellant, for their full amount. But this claim is groundless. As between the debtor and appellant the claims were extinguished as claims against such debtor, and appel-

lant was entitled to nothing more than its advances.   It understood that its claim was satisfied when it was re-imbursed, and it must be so held.

The circuit court found that the value of the assets given to Brown after appellant had obtained satisfaction of its claims exceeded the amount of appellee's judgment.   This finding is attacked, but we think there is ample justification for it in the record.   The book accounts were of the face value of from $6000 to $7000. Brown was the father-in-law of Q. W. Loverin, and had held a claim, but had settled and assigned it to Tolman for forty cents on the dollar.   He had no claim against the company, and it was a perversion of the trust to give the book accounts to him.   If they were not of their face value, appellant had the burden of reducing its liability for their wrongful disposition by showing that fact.   The first examination of Q. W. Loverin gives some support to the claim that they were shown not to be equal in value to appellee's claim, but his second examination justifies the belief that more than that amount was actually collected by Brown.   If that were not so, the amount collected would hardly furnish a criterion of value.   E. H. Janes, to whom the merchandise was conveyed, was a brother of the vice-president of the Q. W. Loverin Company, and this vice-president found employment in the new business.   Janes expected to do business with some of the old customers who owed book accounts, and it was understood between the parties that the person to whom the book accounts were transferred should not use any harsh methods of collection or proceed to collect in an arbitrary manner, so as to offend the debtors.   This understanding was doubtless carried out.   But even with that understanding enough was collected by Brown to pay appellee in full.

There was no formal agreement on the part of appellant to account for any surplus, and in form the conveyance was absolute and unqualified.   But we cannot see

that it makes any difference what the form of the transaction was. The estate, while in the hands of the assignee, was devoted to pay appellant its claim and advances, and was applied to such use, and whatever the bargain was as formally made or tacitly understood, that disposition of the estate was a fraud upon the rights of appellee.

We approve of the decree, and the judgment of the Appellate Court will be affirmed.      *Judgment affirmed.*